# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTA KATSENES,<br><br>    Plaintiff,<br><br>v.<br><br>U.S. BANK TRUST, N.A., AS TRUSTEE FOR<br>LSF9 MASTER PARTICIPATION TRUST,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No. 1:19-cv-12112<br>)<br>)<br>)<br>)<br>)<br>) |

## CHRISTA KATSENES' OPPOSITION AND MEMORANDUM IN OPPOSITION TO MOTION TO QUASH
## AND/OR ISSUE PROTECTIVE ORDERS OF U.S. BANK. N.A.,
### and
## REQUEST FOR ORAL ARGUMENT

### Matters Pending

Christa Katsenes, the plaintiff in the case in chief and defendant in counterclaim in the above-captioned matter ("Christa"), does hereby object to the Motion to Quash Subpoenas and/or Issue Protective Order by U.S. Bank N.A., as Trustee for LSF9 Master Participation Trust, the defendant in the case in chief and plaintiff in counterclaim ("U.S. Bank" or "the Bank") and respectfully submits this Memorandum in support of her opposition. to.  Christa has simultaneously filed her Opposition to the Motion to Quash and/or Issue a Protective Order brought by WFG National Title Insurance Company, Inc., a non-party ("WFG Title" or "WFG"), and her Memorandum in support thereof, which is incorporated by reference and made part hereof.

<u>Facts</u>

On or about August 28, 1986, Christa purchased the property at 25 Pleasant Street, Dover, Massachusetts ("the locus") by a deed dated August 28, 1986, a copy of which deed is attached to the First Amended Complaint as Exhibit 1.[1]  The locus is a single-family home which since the time of her purchase has been and continues to be Christa's principal residence.  Title to the locus remained in the sole name of Christa from August 28, 1986 to December 20, 1990, at which time she conveyed title to her husband, William A. Katsenes ("William") and herself as "husband and wife as tenants by the entirety."  A copy of said deed is attached to the First Amended Complaint as Exhibit 2.

Unbeknownst to Christa on August 19, 2005 William alone executed a mortgage on the locus to Bank of America, N.A., securing a $500,000 loan.   A copy of said mortgage is attached to the first Amended Complaint as Exhibit 3.  As is apparent from the mortgage Christa's name appears nowhere on it.   She signed neither the mortgage, the promissory note, nor or any other documents relating to said transaction.  She did not participate in it in any way and did not learn of it until 2017.On or about May 17, 2016, Bank of America assigned said mortgage to U.S. Bank, N.A., as Trustee for LSF9 Master Participation Trust, the defendant and plaintiff in counterclaim.

On September 17, 2018, William Katsenes died, survived by Christa.  On or about February 14, 2019, U.S. Bank commenced an action in the Massachusetts Land Court against Christa under the provisions of the Servicemembers Civil Relief Act, in preparation for foreclosing on the mortgage given by William to Bank of America. Judgment against Christa was entered by the Land Court on September 19, 2019, extinguishing rights, if any, that she

---

[1] In order to minimize the number of exhibits attached to this Memorandum, reference is made to copies of said documents attached to the First Amended Complaint.

might have had under the Servicemembers Civil Relief Act and paving the way for U.S. Bank to foreclose on the 2005 mortgage.

In order to prevent U.S. Bank from proceeding with a non-judicial sale of her home, on September 23, 2019, Christa commenced the instant action in the Land Court, seeking among other remedies a preliminary injunction against U.S. Bank.  U.S. Bank subsequently removed the case to this Court.  By stipulation of the parties any action with respect to foreclosure has been stayed.

Further facts are set forth in the Argument below as needed.

<u>Argument</u>

In this case, Christa has once again been met with the Bank's continued stonewalling discovery tactics in an attempt to strangle in the crib the Plaintiff's efforts to expose the totality of the Defendant's culpability and knowledge which will bar its claim of equitable subrogation.[2]

The issues raised in today's Motions to Quash and/or for Protective Orders are a mirror image of the issues raised in the Motion to Modify Subpoenas and/or issue a Protective Order brought by the Bank to Christa's previously filed subpoenas to Vylla Title, LLC, f/k/a Carrington Title Services, LLC ("Carrington") and the law firm of Doonan, Graves & Longoria ("Longoria law firm").  See Docket, # 52 and #53.  Attached hereto as Exhibit 2 is the transcript of the hearing on said previously filed Motion to Modify heard by this Honorable Court on September 21, 2020.  This Honorable Court has determined  (i) that the title insurance policy should be produced; and (ii) that any documents relating to payment under the policy are relevant and should be produced; and (iii) any correspondence that relates to claims or relates to payment should be produced.  (Hearing Transcript, Exhibit 2, page 12).

---

[2] See, for example, representative Bank's Response to Request for Admissions reproduced and attached hereto as in Exhibit 1.

As discussed in more detail below, with the documents that this Honorable Court ordered produced, Christa has now served deposition subpoenas upon two of the same parties; namely, Attorney Reneau Longoria and Vylla Title, LLC, formerly known as Carrington Title Services, LLC ("Carrington") (the writing agent that produced the policy). Now, in addition, subpoenas were served upon LSF9 Mortgage Holdings, LLC (the affiliate of the plaintiff Bank that in fact purchased the Katsenes Loan and mortgage) ("Katsenes Loan") from Bank of America and WFG (the title company).

The Bank has repeatedly claimed that Christa's deposition notices are (i) a fishing exhibition; (ii) that the circumstances of the title insurance are irrelevant; (iii) there is no hint of any impropriety on behalf of the Bank; and (iv) the sole issue in this case is whether the plaintiff must repay hundreds of thousands of dollars in mortgage, debt payoff, taxes and insurance that *she* has avoided for over 7 years.  The third-party witness WFG in its memorandum, page 8, makes the bold claim that "… the defenses in this case are exceedingly narrow."

In the leading case of *East Boston Savings Bank & another v. Lois J. Ogan*, 428 Mass. 327 (1998) (hereinafter referred to as "*Ogan supra*"), Massachusetts defined the law of equitable subrogation.  The Defendant and WFG point to the five-prong test to establish an equitable subrogation claim; i.e., (i) Bank of America, predecessor to U.S. Bank, made the payment; (ii) it was not a volunteer; (iii) it was not its debt; (iv) it paid off all of Christa's debt; but (v) they gloss over that the subrogation would not work and the injustice to the rights of the junior lienholder.[3] They argue that the relevant evidence in this case ends there.  However, the Bank and WFG

---

[3] It should be noted there is no junior lien holder as such.  The traditional equitable subordination case arises out of a mistake in which the plaintiff subrogee seeks to realign the priority of the mortgagees to be in the senior position for which it bargained and without which it suffers a loss.  In the Katsenes case there is no mortgage on the locus, other than the one held by U.S. Bank.

completely fail to advise this Court of the totality of the holding in *Ogan supra* and its progeny

followed repeatedly in Massachusetts.

First, *Ogan supra* holds that equitable subrogation is a **broad** equitable remedy

"… depending on the individual case."

But, then, *Ogan supra* specifically supports the defenses that Christa seeks to

explore in discovery and holds:

> "**The court must also examine the actions of the subrogee.  The degree of knowledge attributable to a subrogee concerning the existence of the intervening mortgage may nullify equitable subrogation.**  Some courts subrogate without regard for the subrogee's knowledge.  See *Klotz v. Klotz*, 440 N.W.2d 406, 409-410 (Iowa Ct. App. 1989); *Trus Joist Corp. v. National Union Fire Ins. Co.*, 190 N.J. Super. 168, 179 (App. Div. 1983), rev'd on other grounds, 97 N.J. 22 (1984); *Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516, 520 (Tex. 1969).  See also *Restatement*, *supra* at Reporters' Note, at 529.  Others will deny subrogation where the subrogee has actual knowledge, but will permit it where the subrogee has constructive knowledge.  See, e.g., *Smith v. State Sav. & Loan Ass'n*, 175 Cal. App. 3d 1092, 1098 (1985); *United Carolina Bank v. Beesley*, 663 A.2d 574, 576 (Me. 1995).  Other courts deny equitable subrogation to a subrogee who has mere constructive of the intervening lien.  See *Independence One Mtge. Corp. v. Katsaros*, 43 Conn. App. 71, 74-75 (1996).  (Emphasis supplied.)

> "We decline to adopt a bright line rule concerning subrogee knowledge.  We are persuaded by the reasoning of courts that not only allow subrogation where the subrogee has actual or constructive knowledge of the intervening mortgage, but also look to equity to decide if subrogation is appropriate.  See *Davis v. Johnson*, 241 Ga. 436, 439-440 (1978). '[K]nowledge is not necessarily fatal to the grantee's claim of subrogation, if equity would nonetheless dictate the recognition of subrogation.'  *Restatement, supra* at s. 7.6 comment d, at 518.  **The court must determine, under the circumstances, if the subrogee acted with sufficient knowledge to merit denying subrogation where it would otherwise be the correct result**. (Emphasis supplied.)

> "Subrogee culpability, like their level of knowledge concerning intervening liens, is not susceptible to a clear rule that might distinguish acts that negate the use of subrogation from those that do not.  **The subrogee's behavior is an important consideration that the court must balance in its equitable analysis of the interests of both mortgagees**.  See *Worcester N. Sav. Inst. v. Farwell*, 292 Mass. 568, 574 (1935)." (Emphasis supplied.)

The foregoing principles of equitable subrogation have been followed repeatedly in

Massachusetts case law.  See, for instance, *Wells Fargo Bank, N.A., Trustee v. Comeau*, 92

Mass. App. Ct. 462 (2017); *Wells Fargo Bank, N.A. v. National Lumber Company*, 76 Mass.

App. Ct. 1 (2009); *Stewart Title Guaranty Company v. Kelly*, 97 Mass. App. Ct. 325 (2020); See,

also, *Restatement (Third) of Property (Mortgages)* s. 7.6(a) (1997).

Discovery

In addition to the documents ordered produced at the prior hearing, Christa undertook

further paper discovery in the form of Rule 36 Request for Admissions and Rule 34 Request for

Production of Documents and then issued a Fed. R. Civ. P. Rule 30(b)(6) Notice of Deposition

("Rule 30(b)(6) deposition") upon the Bank.

Discovery has uncovered that on July 10, 2014, the Holding Company created the entity

which is the Bank plaintiff in counterclaim in this action.  In the spring of 2016, Bank of

America assembled for sale a package of non-performing mortgages.  Among the loans packaged

for sale was the Katsenes Loan.  An apparent affiliate of U.S. Bank known as LSF9 Mortgage

Holdings, LLC ("Holding Company") was the successful bidder at a discount price and closed

on the loan package as of March 30, 2016.

With the hard fought for paper discovery in hand, Christa noticed pursuant to Fed. R.

Civ. P. 30(b)(6) the deposition of U.S. Bank.  The Bank designated Tonya Tillman, an employee

of Caliber Home Loans ("Caliber") as its only witness to respond to the areas of discovery

described in the notice.[4]  Caliber is a professional mortgage servicing company which originally

acted as agent and servicer for Bank of America, while Bank of America owned the Katsenes

---

[4] Fed. R. Civ. P. 30(b)(6) provides "… the person designated must testify about information known or
reasonably available to the organization."

Loan.  Caliber, thereafter, became the servicer for both the Holding Company and U.S. Bank when it acquired the Katsenes Loan.

Discovery uncovered that as early as 2013 Bank of America had internal documents that showed that the Katsenes Loan was only signed by William.

In January of 2016, apparently incident to preparing the package of non-performing loans for sale, Caliber acting for Bank of America had a title report done by Stewart Title.  That report showed that Christa had not signed the mortgage and therefore the mortgage was subject to her rights of survivorship.  Attached hereto as Exhibit 3 is the Stewart Title Report.

Finally, on April 7, 2016, three weeks before the assignment of the Katsenes Loan to the Bank on May 17, 2016, Caliber commissioned yet another title report prepared by CoreLogic (attached hereto as Exhibit 4) which was effective through March 31, 2016, it confirmed the borrower was William Katsenes but the title was in the name of William Katsenes and Christa Katsenes, husband and wife as tenants by the entirety.

In the 30(b)(6) deposition, the designated witness was asked why with three title examination reports indicating the William Katsenes mortgage was not valid security on fee simple title, was not the Katsenes Loan pulled from the package of loans being sold by Bank of America.  The witness had no explanation why not.  At pages 96-97 (attached as Exhibit 5), the witness continued:

> "A.      Well, if it doesn't have clear title, it's up to us to see why it's not
> and -- and see if we can get title clear, reach out to the entities to clear those.
>
> Q.      **And is that exactly what you did?  Caliber to clear the title got
> a title insurance policy, didn't they?**
>
> A.      **Yes."** (Emphasis supplied.)

Discovery has shown that in a form not used until the year 2015, WFG National Title Insurance Company ("WFG") issued retroactively to the date of the Katsenes Loan, August 19, 2005, a title insurance policy purporting to confirm that the issued mortgage on the Locus is a fee simple interest vested in the borrower.

Carrington was the writing agent for the WFG title insurance policy.  In fact, Carrington did its own title examination and secured a report dated July 25, 2016, showing that title to the locus was in the name of William A. Katsenes and Christa Katsenes, husband and wife as tenants by the entirety, but concluding with the following statement:  "Christa Katsenes, joint owner herein did not pledge her interest under mortgage."

In the Agreement wherein Bank of America sold the loans, including the Katsenes Loan , Bank of America warranted that each mortgage was security on fee simple title.[5]  It further provided the purchaser had the right to rescind the sale within 6 months from the date of purchase for breach of the warranty.  At page 107 (attached as Exhibit 6) in the 30(b)(6) deposition, the witness was asked:

> "Q.    … why Caliber within the six months warranty period did not
> make a claim against Bank of America for breach of warranty if this was not a
> first lien and fee simple title.
>
> A.     I don't know."

The law firm of Doonan, Graves & Longoria (and principally by its partner Reneau Longoria) ("Longoria law firm") represented U.S. Bank at the time and it initiated the prelude to foreclosure proceeding against Christa which prompted Christa to file the original complaint to enjoin the foreclosure.

---

[5] See Exhibit 2, hearing transcript, page 6, wherein this Honorable Court determined that warranties go to damages and should be produced.

Discovery yielded a letter dated September 27, 2017 (when William was still alive) from the Longoria law firm to WFG making a claim against the title insurance policy. There followed substantial correspondence back and forth between the Longoria law firm and Jesse Cortese, an attorney and officer of WFG, concerning the claim upon the title insurance policy. Initially, WFG refused to provide coverage. On April 21, 2020, in an email by Reneau Longoria to Attorney Cortese at WFG, Attorney Longoria laid out the strength of the U.S. Bank's claim that not only was it entitled to coverage under the title insurance policy, but it explained to WFG that its closing agent (Carrington) was aware that William Katsenes was married and his wife was co-owner of the mortgaged property. The discovered billing records of the Longoria law firm reflect that after that detailed email, WFG had "a change of heart" and agreed to cover the loss and appointed counsel. The hand-written records of Attorney Longoria regarding this matter state: "Amy, Thursday, settlement." To close the loop, "Amy" unquestionably refers to Amy McFadden an attorney for Carrington. Thus, the Bank by its Attorney Longoria, together with WFG Title Insurance Company and Carrington, the originator of the knowingly false title policy, reached a settlement on the Katsenes Loan.

Within days of that settlement, U.S. Bank's original counsel withdrew and in their stead is present counsel, Robinson and Cole, principally by Attorney Lawrence Heffernan and Julianna Charpentier entered an appearance.

The Bank's response to Request for Admission 32 (see Exhibit 1) and their testimony on the 30(b)(6) deposition admits that U.S. Bank is a separate entity from the Holding Company and that U.S. Bank did not pay anything for the assignment of the Katsenes Loan to U.S. Bank. The 30(b)(6) deposition witness was asked a series of questions to explain the circumstances of how U.S. Bank that did not pay anything to acquire the Katsenes Loan and mortgage came to become

the holder of the note and mortgage.  The designated witness admitted that it was a fair statement that she did not know the circumstances of how U.S. Bank ended up as the holder of the William Katsenes Loan and mortgage (at page 92 of the 30(b)(6) deposition) (attached as Exhibit 6) nor could she explain how U.S. Bank could have suffered any loss if it did not pay anything to receive the assignment from Bank of America of the Katsenes mortgage

The Need for the Four Noticed Depositions

**Respectfully**, if Christa can show that:

1. related high finance corporations in the business of buying non-performing loans at a discount, purchased the Katsenes Loan with full knowledge that their security would be subject to Christa's right of survivorship, but were willing to accept the risk because the property had substantial equity;

2. the Bank had the right to rescind but elected not to do so;

3. Carrington in league with the Bank's agent Caliber, issued a title insurance policy retroactive to the date of the loan (August 19, 2005) purporting to guarantee fee simple title, with full knowledge that the mortgage was defective and subject to Christa's rights of survivorship;

4. the Bank never sought to foreclose or pursue William during his lifetime and never made a claim against his estate;

5. after William died, the Bank tried to intimidate Christa to pay her husband's debt by initiating the action under the Servicemember's Civil Relief Act in the Land Court and published in the local newspaper the Order of Notice;

6. Christa did not succumb to pay her husband's debt;

7.  when the Bank succeeded with the assistance of its counsel, Reneau Longoria, to persuade WFG to honor its title insurance policy;

8.  when WFG rightfully looked to Carrington that knowingly procured the title insurance policy; and

9.  in the handwritten note of Attorney Longoria, the Bank "settled" the dispute by agreeing with WFG and Carrington to first pursue Christa with Carrington picking up any shortfall --

**Then**, in the words of *Ogan supra*, be it a bright line or not, the line has certainly been crossed and an equity court will determine that "… the subrogee acted with sufficient knowledge to merit denying the subrogation …" and, in equitably balancing the interest, the subrogee's behavior, a court should deny their claim.  Equity should not provide the Bank relief when they lost on the risk they knowingly took in acquiring the Katsenes Loan.  *Stewart Title Guaranty Company, supra.*

Anything discovered in the subject four depositions that is truly private or confidential is completely protected under the Protective Order previously granted on the motion of the Bank.

For the defense of Christa and in support of a future motion for summary judgment, her undersigned counsel critically needs to authenticate the documents and elevate the foregoing inescapable inferences to become undisputed facts.

### A.  The Longoria Deposition Subpoena

Attorney Reneau Longoria ("Longoria") was not originally trial counsel in this matter and only elected to enter an appearance as co-counsel after she had been compelled to produce documents under a subpoena duces tecum all of which made it obvious that she was a principal actor and that she possessed critically relevant evidence.

At the outset, if for no other reason, Longoria's testimony is relevant because it is Longoria's conduct in instituting the Land Court process under the provisions of the Servicemembers Civil Relief Act as the routine prelude to formal statutory foreclosure proceeding, and it was she who published the notice in the local newspaper causing the embarrassment and emotional distress for Christa. Obviously, she knew such a foreclosure could not convey clear title and her motivation was to intimidate Christa with the hope she would pay her late husband's debt. All of the foregoing is the core factual basis for the existing Christa Ch. 93A Count in this case that needs discovery.

More importantly, it is Longoria acting on behalf of her client, the Bank, who uncovered and possesses all of the evidence discussed above not only establishing there was a binding title insurance policy issued by WFG, but also digging into the scurrilous circumstances under which the retroactive title insurance policy was issued with full knowledge that title was defective.

The Bank and WFG argued since Christa has seen the documents, what more do they need? Respectfully, common discovery practice is to secure the documents and then take the deposition of the appropriate party to authenticate the documents and to fill in the blanks on the trail the documents provide.

The testimony sought from Longoria does not seek to inquire into the confidential attorney-client relationship with her client, the Bank. There is nothing confidential about her actions on behalf of the Bank (i) to commence a proceeding in the Land Court or (ii) to deal arm's length with WFG and (iii) to persuade them to provide coverage or (iv) to enter into a 3-party agreement on behalf of her client, the Bank, WFG, the title insurance company, and Carrington who procured the policy with full knowledge of the title defect. Should the deposition inquiry invade a privileged area, counsel for the Bank and WFG would be well within

their rights to instruct her not to answer and the issue would be ripe for judicial determination if necessary.

Bank's memorandum on pages 8-9 cites the rule in the *Shelton* case and the *Bogosian* First Circuit case.  The Longoria notice of deposition meets the test.

In the Rule 30(b)(6) deposition transcript, page 135 (attached as Exhibit 8):

"Q.      … What is your understanding whether the title insurance company is going to pay the claim if you don't collect against Christa?

A.      As the servicer, like I said, I would not be privy to what exactly the settlement is with the attorneys.  That's something the lawyers worked out.  I don't –

Q.      Are you telling me that I have to take the deposition of a lawyer?

MS. CHARPENTIER:  Objection.

Q.      **That seems logical, doesn't it?** (Emphasis supplied.)

A.      **Yes."** (Emphasis supplied.)

Obviously, Christa has met the Shelton test: (i) there is no other means to obtain the information; (ii) the information is relevant and non-privileged; and (iii) the information is critical in preparation of the case.

**B.  The WFG Deposition Subpoena**

In the light of the separate Motion to Quash and for a Protective Order filed by WFG, Christa incorporates by reference her companion Memorandum in Opposition to the same filed simultaneously herewith.

### C.  The LSF9 Mortgage Holdings, LLC Deposition Subpoena

The Holding Company was the successful bidder of the portfolio of non-performing loans (including the Katsenes Loan) that was purchased from Bank of America.  It appears their managers are the LSF9 Bermuda Mortgage Holdings, Ltd. and REO Investment, LLC.

U.S. Bank's counsel has steadfastly resisted Christa's counsel from peeling back the levels of the shell game under which the Bank itself was created by the Holding Company and how the Bank intends to prove its damages.  The Bank repeatedly refused to respond to requests for admissions designed to lock down the undisputed fact that the Bank had no loss and that the Holding Company which the Bank repeatedly claims is a separate entity paid the consideration to buy the book of loans from Bank of America.  The Bank has claimed that some party paid $426,381.53 for the Katsenes Loan.[6]

Rule 30(b)(6) Deposition, pages 89-90 (attached as Exhibit 9):

"Q.     Who paid the $426,000 to Bank of America for this loan allegedly?

A.     I don't know …

Q.     Well, let's agree there is a agreement in addition to request admissions that the figure I had read before, which is 426,000 and some change, was paid for this loan.  I just don't know, who paid for it?

A.     It would be LSF9 that would have paid an undisclosed amount for the loan, yes.

Q.     Which is the holding company?

A.     Yes.

---

[6] The underlying moral and legal principal of equitable subordination is one innocent party has suffered a loss and another innocent party has received the benefit and been unjustly enriched.  It is fundamental the if the Plaintiff-in-Counterclaim Bank suffered no loss, they have no standing to seek equitable subrogation.

Q.      Okay.  Not the party Defendant, Plaintiff-in-Counterclaim in this

case, separate entity?

A.      Separate entity, yes."

At page 92 of the Rule 30(b)(6) Deposition (attached hereto as Exhibit 10):

"Q:     All right.  And just in leaving this, Ms. Tillman, you don't know

the circumstances of how it is that, in this transaction which we are seeing bits

and pieces of, the documents being produced, that the U.S. Bank trustee, party in

this case, ended up as the holder of this note and mortgage?  You don't know the

circumstances; is that a fair statement?

A.      That's a fair statement."

Thus, U.S. Bank's 30(b)(6) witness was obligated to testify to information known or

reasonably known to the organization yet she could not explain the circumstances under which

the Katsenes Loan was assigned to U.S. Bank.  Nor could she show that U.S. Bank had suffered

any loss.

The Bank as plaintiff-in-counterclaim has the burden of proof to show that it, by

assignment, is the proper holder of the Katsenes Loan and that the Bank has suffered a loss.

Apparently, the answer to these critical questions will be by the person or persons that the

Holding Company choses to designate in response to Christa's Rule 30(b)(6) notice.  Christa

needs to discover this evidence before the trial.  The deposition is critical to Christa's defense.

### D.  The Carrington Deposition Subpoena

It is undisputed that Caliber, the service agent for the Bank, determined in their due diligence before the Bank acquired the Katsenes Loan that the security was not on fee simple title.

Caliber acting on behalf of the Bank reached out to Carrington to procure a title insurance policy so that the attractive Katsenes Loan would not be pulled from the package.

Carrington's designated Rule 30(b)(6) witness should testify to the instructions it received from Caliber and confirm that they and Caliber knew that the Katsenes title was defective.  Nevertheless, Carrington issued the title policy showing a valid and enforceable mortgage.  In addition, Carrington, through its attorney, Amy McFadden, settled the claims with the Bank's counsel, Longoria law firm.  Carrington's designated witness should provide the Court with the full panoply of facts to be equitably balanced to determine what relief, if any, should be granted.

<u>Miscellaneous Points</u>

A.      The Bank and WFG stress in their memorandum that because the court did not allow Christa's motion to add tort counts that somehow all of the evidence of the Bank's knowledge and culpability evaporates.  The ruling of the court denying the tort counts as set forth in the WFG memorandum was based on Christa's inability to plead that the actions of WFG and the Bank acting together and in prosecuting their counterclaim did not show an unlawful purpose or by unlawful means.  The Bank and WFG completely overlooked that the Court allowed Christa's amendment to add the Ch. 93A count which, of course, is predicated upon unfair and deceptive conduct and often times on common law tort principles.

B.      The Bank argues that because under Rule 30(b)(6) the Exhibit A designated the areas upon which the inquiry would be made is so broad that somehow Christa has forfeited her right to take the deposition.  Judicial review of disputes under 30(b)(6) almost invariably involve the witness being asked questions which were not designated on the Exhibit A areas of inquiry and the witness was not the right person to respond to those areas of inquiry.  Christa, out of an abundance of caution, on all Exhibit As in each deposition, knowing the propensity for the Bank to object deliberately, gave notice of every area she could possibly conceive the evidence might lead.  If the inquiry goes beyond where it should, Bank's counsel is perfectly capable of instructing the witness not to answer.

C.      The Bank has not met the test articulated in its own brief of the standing to quash subpoenas issued to third party witnesses: (i) the Holding Company, which it steadfastly insists is a separate entity; (ii) WFG, the title insurance company; and (iii) Carrington, the loan servicing agent that produced the title insurance policy.  Other than Longoria, there is no suggestion of a privilege and the fact there is none has already been addressed above.  In any event, it is not the Bank's privilege.  Where is the Bank's personal right to keep secret their knowledge and their culpability in knowingly purchasing a defective mortgage and then obtaining title insurance in an attempt to cover a potential loss?

D.      As previously noted above, the Bank has the benefit of a Protective Order granted at their request.  Other than WFG, Carrington and the Holding Company have not even sought in their own right a motion to quash and/or protective order.

E.      Fed. R. Civ. P. Rule 26(c)(1) sets out the standard for seeking to quash these depositions by requiring the Bank to show "annoyance, embarrassment, oppression or undue expense."  Respectfully, in seeking to collect her husband's debt from this 80-year-old widow

who is trying to keep her home, how can these offshore financial discount hunters show it is

"annoying" or an "embarrassment" or "oppression" or "costing them an undue expense" to have

Christa take the deposition of third-party witnesses.  They have not met their burden of making

any such showing.

Conclusion

The Plaintiff, Christa Katsenes, respectfully requests that the Bank's Motion to Quash

and/or for Protective Order on the third-party witnesses be denied and that the Plaintiff be

granted leave to subsequently file a Motion for Attorneys' Fees in opposing the Bank's motions.

Request for Oral Argument

Christa does hereby respectfully request an oral argument.

Respectfully submitted,

Plaintiff, Christa Katsenes,
By her attorneys,


/s/ Robert E. McLaughlin, Sr.
Robert E. McLaughlin, Sr. (BBO #337480)
Gilman, McLaughlin & Hanrahan, LLP
101 Merrimac Street
P.O. Box 9601
Boston, MA 02114-9601
(617) 227-9999
remsr@gilmac.com


/s/ Sylvia Katsenes
Sylvia Katsenes (BBO #408100)
Katsenes and Katsenes
743 Washington Street
Newtonville, MA 02160
(617) 244-2137
skatsenes@gmail.com


Dated:  February 3, 2022

## <u>CERTIFICATE OF SERVICE</u>

I, Robert E. McLaughlin, Sr., hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic (NEF) and paper copies will be sent to those indicated as non-registered participants on February 3, 2022.

*/s/ Robert E. McLaughlin, Sr.*
Robert E. McLaughlin, Sr.