## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTA KATSENES, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 19-cv-12112-DJC |
| U.S. BANK TRUST, N.A., as Trustee for LSF9 Master Participation Trust, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                 **January 17, 2023**

### I.      Introduction

Christa Katsenes ("Katsenes") filed this lawsuit against Defendant U.S. Bank Trust, N.A. ("U.S. Bank"), as trustee for LSF9 Master Participation Trust, regarding the validity of a mortgage, seeking declaratory judgment (Count I) and alleging unfair and deceptive business practices in violation of Mass. Gen. L. c. 93A, §§ 2, 9 (Count II).  D. 85.  In response, U.S. Bank raised four counterclaims:  equitable mortgage (Counterclaim Count I); equitable subrogation (Counterclaim Count II); unjust enrichment (Counterclaim Count III); and quantum meruit (Counterclaim Count IV).  D. 87.  Presently before the Court are Katsenes' partial motion for summary judgment as to Count I and U.S. Bank's counterclaims, D. 143, her motion to strike certain exhibits offered by U.S. Bank, D. 154, and U.S. Bank's motion for summary judgment as to all claims and counterclaims, D. 146.  For the reasons explained below, the Court DENIES Katsenes' partial motion for summary judgment as to Count I and Counterclaim Count II and DENIES summary

1

judgment on the remaining counterclaims as moot, D. 143, DENIES her motion to strike certain exhibits offered by U.S. Bank, D. 154, and ALLOWS U.S. Bank's motion for summary judgment as to Count I, Count II, and Counterclaim Count II, thus granting equitable subrogation, and denies summary judgment on the remaining counterclaims as moot in light of the Court's ruling on Counterclaim Count II, D. 146.

## II.    Standard of Review

The Court grants summary judgment where "there is no genuine dispute as to any material fact" and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citation and internal quotation marks omitted). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000) (citations omitted). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial, Borges v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing cases). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted). "When facing cross-motions for summary judgment, a court

must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197–98 (D. Mass. 1991) (citing Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2720 (1983)).

### III.    Factual Background

Unless otherwise noted, the following facts are undisputed.  These facts are primarily drawn from the parties' statements of material facts, D. 145; D. 148, the parties' responses to same, D. 150; D. 153, and supporting exhibits.

Katsenes married William A. Katsenes ("Mr. Katsenes") on January 23, 1976.  D. 150 ¶ 1. On August 28, 1986, Katsenes alone purchased a property located at 25 Pleasant Street, Dover, Massachusetts ("the Property") and recorded the deed with the Norfolk County Registry of Deeds ("the Registry").  Id. ¶ 2. Title to the Property remained solely in her name until December 20, 1990, at which time she conveyed title to the Property to her husband, Mr. Katsenes, and herself as "husband and wife as tenants by the entirety." D. 145-3 at 1.  This conveyance was recorded in the Registry on December 28, 1990.  D. 153 at 2.

On August 6, 2003, Katsenes and Mr. Katsenes executed a mortgage for a home equity line of credit secured by the Property to Citizens Bank of Massachusetts in the amount of $150,000 ("the 2003 Katsenes HELOC").  D. 148-3.  It was recorded in the Registry on August 11, 2003. D. 153 at 2.  On March 31, 2004, Katsenes and Mr. Katsenes executed an open-ended mortgage to Fleet National Bank secured by the Property in the amount of $200,000 ("the 2004 Katsenes Mortgage").  D. 148-5.  It was recorded in the Registry on May 3, 2004.  D. 153 at 2.  On April 13, 2005, Katsenes and Mr. Katsenes executed a mortgage for a home equity line of credit to

Citizens Bank of Massachusetts in the amount of $150,000 ("the 2005 Katsenes HELOC").  D. 148-6.  It was recorded in the Registry on May 11, 2005.  D. 153 at 3.

On August 19, 2005, Mr. Katsenes signed a promissory note ("the Promissory Note") for a line of credit issued by Bank of America, N.A. ("BANA") with a credit limit of $500,000 ("the 2005 Mortgage").  D. 148-9; D. 150 at ¶ 15.  Katsenes' name does not appear on the 2005 Mortgage and she did not sign it or the Promissory Note, D. 148-9; D. 150 ¶¶ 23-24, and she claims she was unaware of the transaction at the time, D. 145-1 ¶¶ 7–8, 11.  At the time of this transaction, BANA did not obtain a lender's title insurance policy on the 2005 Mortgage.  D. 150 ¶ 19.  In BANA's Documentation Checklist for this transaction, a document entitled "Borrower's Limited Title Agreement" is noted, but U.S. Bank has not produced it in discovery and claims not to have it.  Id. ¶ 21.

On September 14, 2005, a discharge of the 2004 Katsenes Mortgage to Fleet National Bank was executed and recorded in the Registry on September 21, 2005.  D. 145-11.  Less than two months later, on November 9, 2005, the 2005 Mortgage was recorded in the Registry.  D. 145-8.  The last payment towards the 2005 Mortgage was made on December 2, 2013.  D. 148-13 at 5.  The 2003 Katsenes HELOC and 2005 Katsenes HELOC were discharged on March 1, 2016.  D. 148-17; D. 148-19.  On March 30, 2016, BANA sold the 2005 Mortgage to LSF9 Mortgage Holdings LLC ("LSF9 LLC").  D. 145-29.

Caliber Home Loans, Inc. ("Caliber") was the servicer of the 2005 Mortgage from some time in January or April 2016 until at least July 2021.  D. 150 ¶ 42.  A January 2016 title examination report demonstrated that the Property was owned by Katsenes and her husband, but only Mr. Katsenes signed the 2005 Mortgage.  D. 145-27.  Caliber received another title report on

April 7, 2016, similarly describing the Property as owned by Katsenes and her husband but noting that Mr. Katsenes was the only signatory to the 2005 Mortgage.  D. 145-31.

On May 17, 2016, BANA assigned the 2005 Mortgage to U.S. Bank as Trustee for the LSF9 Master Participation Trust.  D. 145-32.  The assignment and the discharges of the 2003 Katsenes HELOC and 2005 Katsenes HELOC were recorded in the Registry on June 30, 2016.  D. 150 ¶ 70.  Katsenes testified that she learned of the 2005 Mortgage in 2017.  D. 153 at 18–19.

On July 25, 2016, LSF9 Master Participation Trust ordered a title insurance policy from a company then-known as Carrington Title Services, LLC ("Carrington").  D. 150 ¶ 78.  Carrington performed a title examination, which revealed Katsenes' ownership interest and the fact that she "did not pledge her interest" in the 2005 Mortgage.  D. 145-38 at 1, 4.  Carrington, as agent of WFG National Title Insurance Company ("WFG"), issued the lender's title insurance policy retroactively to August 19, 2005, in the amount of $500,000.  D. 145-40.

Mr. Katsenes died on September 17, 2018.  D. 150 ¶ 105.  Since its assignment in 2016, U.S. Bank has been paying the real estate taxes and insurance on the Property.  D. 153 at 17–18.  U.S. Bank learned of Mr. Katsenes' death on or about January 16, 2019.  D. 150 ¶ 109.

## IV.   Procedural History

On February 14, 2019, U.S. Bank commenced an action in the Massachusetts Land Court against Katsenes to determine her military status under the provisions of the Servicemembers Civil Relief Act, as the precursor to foreclosing on the 2005 Mortgage.  Id. ¶ 111. Judgment against Katsenes was entered on September 19, 2019.  Id. ¶ 113.  Four days later, on September 23, 2019, Katsenes instituted this lawsuit in the Massachusetts Land Court, seeking an injunction preventing U.S. Bank from foreclosing on the 2005 Mortgage and a declaratory judgment that the 2005

Mortgage was subject to her right of survivorship and extinguished upon Mr. Katsenes' death.  D. 1-1.  U.S. Bank removed the action to this Court.  D. 1.

On November 30, 2020, Katsenes moved to amend her complaint and assert a variety of state law claims.  D. 65.  The Court denied that motion in part, allowing Katsenes only to add a Mass. Gen. L. c. 93A, § 2 claim.  D. 84.

Both parties have now moved for summary judgment, Katsenes only as to her claim seeking a declaratory judgment and all of the counterclaims, and U.S. Bank as to all claims and counterclaims.  D. 143; D. 146.  Additionally, Katsenes filed a motion to strike certain exhibits proffered by U.S. Bank.  D. 154.  The Court heard the parties on the motions and took the matter under advisement.  D. 158.

## V.     Motion to Strike

Katsenes has moved to strike exhibits 12, 21, and 35, offered by U.S. Bank.

### A.     <u>Exhibit 12</u>

Exhibit 12 is a series of emails between BANA employees from August 2005.  D. 148-12. In particular, U.S. Bank includes an August 3, 2005 email from a BANA employee, in which the employee states that "[BANA] will be the 1st and only lien on [Mr. Katsenes'] home with a value of $500,000" and that "[Mr. Katsenes] is planning on using $200K of the $500K to pay off his existing [Fleet National Bank] Line of Credit."  <u>Id.</u> at 3.  Katsenes moves to strike this email as containing multiple levels of hearsay and that any probative value of same is substantially outweighed by unfair prejudice  under Fed. R. Evid. 403.  D. 155 at 1–7.  U.S. Bank responds that exhibit 12 falls within both the state of mind and business records hearsay exceptions, and it does not rule afoul of Rule 403.  D. 157 at 1–10.

### 1.     *State of Mind Hearsay Exception*

"A statement of the declarant's then-existing state of mind (such as motive, intent, or plan)" is not excluded by the rule against hearsay.  Fed. R. Evid. 803(3).  There, however, must be contemporaneity between the out-of-court statement and the state of mind sought to be proved.  United States v. Rivera-Hernandez, 497 F.3d 71, 81 (1st Cir. 2007).

Here, the statement "[BANA] will be the 1st and only lien on [Mr. Katsenes'] home with a value of $500,000" falls within the ambit of Rule 803(3), as it goes directly to BANA's intent as to August 3, 2005 in wanting to be the first and only lien on the Property.  See, e.g., Packgen v. Berry Plastics Corp., 847 F.3d 80, 90–91 (1st Cir. 2017) (upholding district court's conclusion that testimony from plaintiff's employees regarding plaintiff's customers' intent to purchase plaintiff's new product was properly admitted under Fed. R. Evid. 803(3)); SiOnyx, LLC v. Hamamatsu Photonics K.K., 332 F. Supp. 3d 446, 476 (D. Mass. 2018) (noting that "the statement that 'the deal is off because of HPK's patents' in order to prove that the *reason* the deal was terminated was HPK's patents" is admissible pursuant to Fed. R. Evid. 803(3) and that "[t]he First Circuit has squarely held that testimony of this kind is admissible" (emphasis in original) (citation omitted)); Staelens v. Staelens, 677 F. Supp. 2d 499, 503 (D. Mass. 2010) (explaining that the statements that "Aaron told Nadine that he continued to name her as the beneficiary on his 401(k) account . . . because he wanted to be sure she would be okay and that there was no one else to whom he wished to leave the money" are "statements made by Aaron as to his intent to retain Nadine as beneficiary on his 401(k) account and, therefore, fall squarely within the Rule 803(3) exception").

The contemporaneousness requirement is also met here.  As in Packgen, the fact that the mortgage was executed fourteen days after the statement was made does not run afoul of this requirement.  In Packgen, the plaintiff, who sold catalyst containers, alleged that their new

containers failed because of a defective plastic coating, and then sued the coating supplier. Packgen, 847 F.3d at 83–84.  The plaintiff attempted to prove they lost sales because of the defective coating through employee testimony that decision-makers at 37 refineries had told them, prior to issues with the new containers, that they would purchase containers from the plaintiffs during their "next cycle," which could have occurred between six months to two years after the statement was made.  Id. at 90–91.  The First Circuit found that even though the expected purchase date was not contemporaneous to the statements, their statements were contemporaneous with their mental state.  Id. at 91 (concluding that where "the refineries would actually purchase at a later date, however, does not mean that their statements of intent were not contemporaneous with their mental state").  Likewise, BANA's August 3, 2005 statement of intent was contemporaneous with its mental state as to the later execution of the 2005 Mortgage on August 19, 2005.

Furthermore, an individual employee's statement—as is the case here—is sufficient to show his employer's intention.  See, e.g., id. at 90 (citations omitted); Catalan v. GMAC Mortg. Corp., 629 F.3d 676, 694–95 (7th Cir. 2011).

Finally, the statement that "[Mr. Katsenes] is planning on using $200K of the $500K to pay off his existing [Fleet National Bank] Line of Credit" is admissible because it is being offered for its effect on BANA's state of mind and intent behind the 2005 Mortgage.  See Ira Green, Inc. v. Mil. Sales & Serv. Co., 775 F.3d 12, 19 (1st Cir. 2014) (noting that "[r]umors may be admitted, without regard to their accuracy, to show their motivating effect on the listener" (citations omitted)).

Accordingly, exhibit 12 is admissible as state of mind evidence, an exception to the hearsay rule, and the Court need not reach U.S. Bank's alternative argument that it is admissible under the business records hearsay exception.

2.     *Rule 403 Analysis*

In Katsenes' view, the unfair prejudice from exhibit 12 stems from her belief that U.S. Bank unduly delayed in making its claim until after Mr. Katsenes' death and thus deprived her of the benefit of his testimony, which would allegedly contradict the statements in exhibit 12. D. 155 at 5–7.  Rule 403, however, protects "against unfair prejudice, not against *all* prejudice." United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002) (emphasis in original) (citation and internal quotation marks omitted).  Here, exhibit 12 does not invite the factfinder to decide the relevant issues on an improper basis, has probative value as to the bank's state of mind as discussed above, and the Court concludes that its admission does not amount to unfair prejudice under Rule 403.

**B.     Exhibit 21**

Exhibit 21 is the trust agreement entered into for the LSF9 Master Participation Trust among LSF9 LLC as Depositor, Wells Fargo Bank, N.A., as Certificate Registrar and Trust Paying Agent, and U.S. Bank as Owner Trustee. D. 148-21.  The exhibit is redacted in substantial part, except for the sections entitled "Name and Formation" and "Purposes and Powers." See generally id.  Katsenes moves to strike this exhibit because this redaction prevents her from determining "the full authority of U.S. Bank to bring the lawsuit" or the exact relationship between LSF9 LLC and U.S. Bank. D. 155 at 7–9.  Absent from Katsenes' submissions to this Court, however, is any caselaw which requires exclusion of documents that are redacted, particularly where U.S. Bank only offers them for unredacted sections. See, e.g., Walker v. Alcoa, Inc., No. 4:06-CV-120, 2008 WL 2356997, at *3 (N.D. Ind. June 9, 2008) (denying motion to strike and explaining that "[s]imply because the document is redacted does not mean that it is inadmissible").  Exhibit 21 also need not be excluded under the hearsay rules because it is not hearsay. See Florence Nightingale Nursing Servs. v. Paul Revere Life Ins. Co., No. 94-1757, 1995 WL 422863, at *4

(1st Cir. July 19, 1995) (noting that "[s]igned instruments such as wills, contracts, and promissory notes are writings that have independent legal significance, and are nonhearsay" (quoting <u>Kepner-Tregoe, Inc. v. Leadership Software, Inc.</u>, 12 F.3d 527, 540 (5th Cir. 1994)) (internal quotation marks omitted)).  As such, the Court will not strike exhibit 21.

    **C.**    <u>**Exhibit 35**</u>

      Exhibit 35 is a payoff statement for the 2005 Mortgage dated August 29, 2022.  D. 148-35. As of that date, the total payoff was $676,749.78.  <u>Id.</u> at 2.  The payoff statement was prepared by Fay Servicing, LLC ("Fay"), the current loan servicer for U.S. Bank.  <u>Id.</u>; D. 148-8 ¶ 3.  Katsenes categorizes exhibit 35 as "not a business record nor a document of original entry but instead is apparently a self-serving compilation prepared by U.S. Bank dated August 29, 2022, without reference to any underlying document or testimony to establish the truth thereof as an undisputed fact."  D. 155 at 9.  U.S. Bank contends that exhibit 35 can be properly admitted as a business record, D. 157 at 9, and the Court agrees.

      For the business record exception to apply, exhibit 35 must be: "(1) made at or near the time by someone with knowledge; (2) kept in the regular course of business; (3) made in the regular practice of that activity; (4) as 'shown by the testimony of the custodian or another qualified witness' and (5) free from an indication of a lack of trustworthiness shown by the opponent."  <u>R&T Roofing Contractor Corp. v. Fusco Corp.</u>, 265 F. Supp. 3d 145, 147 (D.P.R. 2017) (quoting Fed. R. Evid. 803(6)(A)–(E)).  Each of these requirements is met here.  Fay's litigation representative, Janet Gioello ("Gioello"), submitted a sworn declaration attesting that: (1) in the course of her regular job functions, she is familiar with the business records Fay maintains for purposes of servicing loans; (2) exhibit 35 was "made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records;" (3) exhibit 35

is "kept in the regular course of business activity;" (4) "[i]t is the regular practice of Fay's mortgage servicing business to make these records;" and (5) she "personally examined" exhibit 35.  D. 148-8 ¶ 4.

Katsenes seems to suggest that exhibit 35 is untrustworthy because it was prepared after the start of litigation.  D. 155 at 9.  While "records 'prepared with an eye to litigation' are not admissible as business records," United States v. Doe, 23 F.4th 146, 150 (1st Cir. 2022) (quoting United States v. Goodchild, 25 F.3d 55, 62 (1st Cir. 1994)), the First Circuit has stated explicitly that "[r]ecords prepared by a debt collections department are primarily made to enable the department to track down debtors and collect money owed.  Th[ese are] not the kind of record[s] . . . prepared with an eye to litigation; [their] purpose [is] to facilitate the collection of debts owed," Goodchild, 25 F.3d at 62 (internal citation omitted); see Smyth v. Am.'s Servicing Co., No. 14-cv-13472-MLW, 2017 WL 1190374, at *6 n.7 (D. Mass. Mar. 30, 2017) (emphasizing that "it is clear from the documents that they were produced by Wells Fargo during the course of the litigation, that they consist of records that were created in connection with the defendant's evaluation of the plaintiffs' loan modification application, and that they were kept in the regular course of Wells Fargo's business").

For all of these reasons, the Court DENIES the motion to strike.[1]  D. 154.

## VI.    Motions for Summary Judgment

As the outcomes of most of the claims turn on whether equitable subrogation is appropriate, the Court will first address the counterclaim seeking equitable subrogation (Counterclaim Count II), for which both parties seek summary judgment.

---

[1] To the extent that U.S. Bank sought attorneys' fees and costs in its opposition, D. 157 at 10–12, the Court denies that motion.

A.     **Equitable Subrogation (Counterclaim Count II)**

Equitable subrogation is a "long-recognized" equitable remedy that has the primary purpose of preventing unjust enrichment.  E. Bos. Sav. Bank v. Ogan, 428 Mass. 327, 328–29 (1998) (citations and internal quotation marks omitted); Wells Fargo Bank, N.A. v. Comeau, 92 Mass. App. Ct. 462, 468 (2017).   Consequently, "[o]ne who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment." Ogan, 428 Mass. at 330 (citation and internal quotation marks omitted).  That is to say, a "new mortgage held by a mortgagor, who used the proceeds of the new mortgage to extinguish an earlier mortgage, may receive the same priority once given to the earlier mortgage."  Id.  The Supreme Judicial Court has laid out five factors relevant to this inquiry:

> (1) the subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a volunteer, (3) the subrogee was not primarily liable for the debt paid, (4) the subrogee paid off the entire encumbrance, and (5) subrogation would not work any injustice to the rights of the junior lienholder.

Id. (citation and internal quotation marks omitted).  However, this remedy is "broad" and "may apply even where one or more of these factors is absent."  Id. (citation and internal quotation marks omitted).

1.     *Statute of Limitations*

Before proceeding to an analysis of the Ogan factors, the Court must address a few preliminary issues, the first of which is the applicable statute of limitations.  Katsenes argues that the statute of limitations is six years, pursuant to Mass. Gen. L. c. 260, § 2, because U.S. Bank is claiming that Katsenes has been unjustly enriched by the payment of prior mortgages from the proceeds of the 2005 Mortgage.  D. 144 at 14–17.

Both Massachusetts state courts and this Court have concluded that the twenty-year statute of limitations set forth in Mass. Gen. L. c. 260, § 21 (applying to actions for recovery of interests in land) applies to claims of equitable subrogation.  See, e.g., Bank of Am., N.A. v. Barnes Hill LLC, No: 16-cv-11583-DJC, 2019 WL 2085996, at *4 (D. Mass. May 13, 2019) (emphasizing that "[i]n Massachusetts, courts have distinguished equitable subrogation claims from contract actions and applied the twenty-year statute of limitations to such claims" (citation omitted)); United Mortg. Servicing, LLC v. Long, No. 984870, 2004 WL 1926329, at *6 (Mass. Super. Ct. June 22, 2004) (explaining that claims for "equitable subrogation . . . are not barred by the six-year statute of limitations . . . because they are not contract actions"), aff'd sub nom. United Mortg. Servs., LLC v. Long, 66 Mass. App. Ct. 1107 (2006).

Katsenes attempts to distinguish this caselaw by emphasizing that equitable subrogation adjusts priorities among mortgages, but here the dispute is between U.S. Bank's mortgage on the Property and Katsenes' interest in the Property—thereby, making the "gist" of U.S. Bank's counterclaim a contract claim.  D. 144 at 15–16.  Equitable subrogation, however, applies in other contexts besides simply adjusting priorities between mortgages.  See Wells Fargo Bank, N.A. v. Thomas, No. 1783-00609, 2018 Mass. Super. LEXIS 2688, at *7 (Mass. Super. Ct. May 30, 2018) (concluding that the proposition that equitable subrogation only applies "in the context of adjusting priorities between mortgages, and that it cannot be stretched to cover a situation where the prior encumbrance is not a mortgage . . . is dubious"); see also PennyMac Loan Services, LLC v. Muzio, No. 19 MISC 000227 (HPS), 2021 WL 837060, at *9–10 (Mass. Land Ct. Mar. 3, 2021) (noting that "[o]ne who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust

enrichment" and "[e]quitable subrogation applies to refinancing situations, such as the present action").

Katsenes also argues that U.S. Bank's claim for equitable subrogation rings in contract because the claim is "based on unjust enrichment." D. 144 at 16-17; see D. 156 at 14. As Massachusetts courts have explained, however, "the purpose of equitable subrogation is to prevent unjust enrichment." Comeau, 92 Mass. App. Ct. at 468. Thus, U.S. Bank's references to unjust enrichment should come as no surprise to Katsenes in an equitable subrogation counterclaim and do not transform the counterclaim to one in contract.

Accordingly, U.S. Bank's counterclaim for equitable subrogation is not time-barred.

### 2. Reformation and Mistake

The Court next turns to Katsenes' arguments regarding reformation and mistake. Throughout her submissions to this Court, she cites to caselaw from Massachusetts state courts on reformation of an instrument based on mutual or unilateral mistake. D. 144 at 7; D. 152 at 3; D. 156 at 1–5. According to Katsenes, such caselaw is relevant because a prerequisite for the granting of equitable subrogation is a finding of fraud or mistake. D. 144 at 3; D. 156 at 5. The Ogan Court stated "[s]ubrogation, however, can be appropriate in the absence of a mistake." Ogan, 428 Mass. at 332 (citation omitted).

That is not to say the existence of fraud or mistake are wholly irrelevant to an equitable subrogation analysis. Indeed, "[t]he right to subrogation rests upon equity," Mass. Hosp. Life Ins. Co. v. Shulman, 299 Mass. 312, 316 (1938) (citations omitted), and to the extent the parties committed fraud or mistake in their agreement, that is an appropriate consideration when determining what equity requires, see, e.g., Ogan, 428 Mass. at 330 (highlighting that "[a] court applying equitable subrogation must ensure that the intervening mortgagee is not unjustly enriched

by succeeding to first priority, but it also must ensure that the intervening mortgagee does not receive a lower priority as a result of the subrogee's mistake"); Norwest Bank Minn., N.A. v. McKinnon, No. 27955 (GHP), 2007 WL 4563642, at *5 (Mass. Land Ct. Dec. 31, 2007) (explaining that "equitable subrogation rests, doctrinally, on the principle that it is fair to make property subject to a mortgage of the same tenor and amount as that originally undertaken or assumed by the property owner, and that it would be unfair to leave that owner's property free of the intended replacement mortgage, solely because of error, or fraud by third parties" (internal quotation marks omitted)).

With this backdrop, the Court turns to each of the Ogan factors for equitable subrogation.

### 3.    Ogan Factors

#### a)    BANA Made the Payment to Protect Its Interest

The original lender, BANA, acted to protect its own interest in the Property.  As evidenced by the internal exchange of emails that Mr. Katsenes was "planning on using $200K of the $500K to pay off his existing [Fleet National Bank] Line of Credit," D. 148-12 at 3, BANA granted Mr. Katsenes the 2005 Mortgage with the intent of protecting their interest in the Property by paying off the prior obligations.

#### b)    BANA Did Not Act as a Volunteer

There is no evidence BANA acted as a volunteer in this case, "since the payoff was part of a refinancing transaction requested by" Mr. Katsenes.  Select Portfolio Servicing, Inc. v. Needel, No. 07 MISC 349527 RBF, 2016 WL 7616796, at *6 (Mass. Land Ct. Dec. 27, 2016); see Wells Fargo Bank, N.A. v. Boroczky, No. BACV200700245, 2010 WL 8609136, at *2 (Mass. Super. Ct. Sept. 1, 2010) (noting that mortgagee did not act as a volunteer "because it had a vested interest in the transaction").

c)      BANA Was Not Primarily Liable for the Debts Paid

BANA was not primarily liable for any of the original mortgages, as Katsenes and her husband were the signatories to the prior transactions.  D. 145-4; D. 145-5; D. 145-6.

d)      BANA Paid Off At Least Some of Prior Encumbrances

In the case at bar, there were three encumbrances on the Property prior to the 2005 Mortgage:  the Citizens Bank 2003 Katsenes HELOC for $150,000, the Fleet National Bank 2004 Katsenes Mortgage for $200,000, and the Citizens Bank 2005 Katsenes HELOC for $150,000. U.S. Bank argues that all three were paid off using the funds from the 2005 Mortgage.  D. 147-1 at 8.  Katsenes argues that, while U.S. Bank may have established that one or two of the Citizens Bank HELOCs were paid from the 2005 Mortgage, it has not demonstrated that the Fleet National Bank 2004 Katsenes Mortgage was paid from the 2005 Mortgage.  D. 152 at 7–8.

Turning first to the Citizens Bank HELOCs, the record establishes that Citizens Bank issued a payoff statement to Mr. Katsenes on August 10, 2005, noting that the total payoff amount was $134,285.25.  D. 148-16; D. 153 ¶ 15.  The payoff statement does not clarify whether this was the payoff amount for one or both Citizens Bank HELOCs.  Id.  The record also establishes that, less than a month later on September 2, 2005, Mr. Katsenes received an advance from the 2005 Mortgage for the same amount of $134,285.25.  D. 148-13 at 2; D. 148-14 at 2.  On June 30, 2016, the discharges of both HELOCs, which were executed by Citizens Bank on March 1, 2016, were recorded in the Registry.  D. 145-34.  Thus, the record only conclusively demonstrates that the proceeds from the 2005 Mortgage were used to pay off and discharge one of the Citizens Bank HELOCs but does not conclusively identify which one or whether it was both.  D. 153 ¶ 15.

 As for the Fleet National Bank 2004 Katsenes Mortgage, the record establishes that, on August 3, 2005, BANA believed that Mr. Katsenes was "planning on using $200K of the $500K

to payoff his existing [Fleet National Bank] Line of Credit." D. 148-12 at 3. The record also establishes that Mr. Katsenes received an advance of $200,453.65 from the 2005 Mortgage on September 2, 2005. D. 148-13 at 2; D. 148-14 at 2; D. 153 ¶ 15. Twelve days later on September 14, 2005, a discharge of the 2004 Katsenes Mortgage was executed. D. 145-11; D. 153 ¶ 17. The discharge was recorded in the Registry on September 21, 2005. Id. Given Mr. Katsenes' statement of intent to pay off the 2004 Katsenes Mortgage, the nearly equivalent value between the advance from the 2005 Mortgage and the amount of the 2004 Katsenes Mortgage, and the temporal proximity between the advance and discharge, no reasonable jury could conclude that the proceeds from the 2005 Mortgage were not used to pay off the 2004 Katsenes Mortgage.

To the extent that it remains unclear whether BANA paid off all encumbrances (including both Citizens Bank HELOCs), equitable subrogation still is appropriate. See, e.g., Ogan, 428 Mass. at 330 (noting that equitable subrogation "may apply even where one or more of these factors is absent" (citation omitted)); Bank of Am., N.A. v. Citizens Bank, No. 14-cv-455-PB, 2015 WL 9305653, at *3–4 (D.N.H. Dec. 21, 2015) (allowing equitable subrogation only as to the mortgage Countrywide paid off because "it is undisputed that Countrywide paid off the first mortgage during the refinancing process").

e)    Subrogation Would Not Result in Injustice to Katsenes

The final Ogan factor requires an analysis of the potential injustice to the junior lienholder, here Katsenes. The Court determines there would be no injustice to Katsenes' interest in the Property.

Here, it is indisputable that Katsenes was liable on all three prior mortgages. D. 145-4; D. 145-5; D. 145-6. And as discussed above, the 2005 Mortgage paid off the 2004 Katsenes Mortgage and at least one of the Citizens Bank HELOCs. Without equitable subrogation, therefore, Katsenes

would reap a windfall and be unjustly enriched because the previous liens for which she was personally liable would be extinguished.  Comeau, 92 Mass. App. Ct. at 468 (emphasizing that "the purpose of equitable subrogation is to prevent unjust enrichment").

The facts that Katsenes was not a signatory to the 2005 Mortgage and claims she did not learn of its existence until over a decade later do not preclude a finding that she would be unjustly enriched.  In Comeau, the Massachusetts Appeals Court addressed a similar issue in the case of Nancy Comeau ("Nancy") and her deceased husband William Comeau ("William").  Comeau, 92 Mass. App. Ct. at 463.  William, who only had a life estate in the relevant property, took out a mortgage in his name only to pay off a prior obligation for which Nancy was not liable.  Id.  This prior obligation was secured by a mortgage granted by both William and Nancy, but only William was obligated to pay it off.  Id.  He subsequently died and the Comeau court concluded that equitable subrogation was inappropriate because, although Nancy was enriched, she was not unjustly enriched.  Id. at 467–68.  In analyzing whether Nancy was unjustly enriched, the Comeau court explained:

> Ultimately, the purpose of equitable subrogation is to prevent unjust enrichment. And as the judge below stated, "Nancy may have been enriched . . . , but she was not unjustly enriched."  While Nancy's interest in the property was no longer at risk of being terminated in the event of a future foreclosure relating to the 2003 mortgage, it was William's liability on the 2003 note that was extinguished by the 2005 loan, not Nancy's, because she was not liable on either note.  Neither William nor Nancy engaged in any improper or deceptive acts that led to Washington Mutual releasing Nancy's interest in the property and relying solely on William's interest for security.

Id. at 468.

Here, unlike in Comeau, Katsenes was obligated to pay off the prior notes.  In Citizens Bank, N.A. v. Teehan, the Massachusetts Land Court was confronted with the case of Carolyn Teehan ("Carolyn"), who, along with her mother Anne Teehan ("Anne"), signed a promissory note

secured by a mortgage on the relevant property.  Citizens Bank, N.A. v. Teehan, No. 19 MISC 000138 (JSDR), 2020 WL 6117763, at *1 (Mass. Land Ct. Oct. 16, 2020).  Anne subsequently took out another mortgage in her name only, used the proceeds to pay off the first mortgage, and died several years later.  Id. at *2.  In arguing against equitable subrogation, Carolyn "primarily" relied on Comeau and insisted that "the only distinguishing fact in [her] case, that Carolyn was a party to the 2006 Note that was paid off by the Bank, does not alter the result that was reached in Comeau."  Id. at *4.  The Massachusetts Land Court disagreed:

> After considering the equities . . . , the fact that Nancy was not obligated on either note appears to have been outcome determinative in Comeau.  Application of the doctrine of equitable subrogation there would have worked an injustice on Nancy.  It works no similar injustice on Carolyn, who was obligated on the 2006 Note.

Id.  The Massachusetts Appeals Court upheld the Massachusetts Land Court's interpretation of the Comeau decision.  Citizens Bank, N.A. v. Teehan, No. 21-P-150, 2021 WL 5829965, at *1 (Mass. App. Ct. Dec. 8, 2021) (observing "like the motion judge, that the holding in [Comeau] turned on the fact that the surviving spouse was not obligated on the note made by her husband to secure the earlier mortgage, and that was satisfied by the subsequent loan").

Accordingly, Katsenes' liability on the prior mortgages is "outcome determinative" as to whether she was unjustly enriched and whether there will be any injustice to her interest in the Property.

### 4.    Other Considerations

Although having already considered the Ogan factor here, the Court must still turn to other relevant considerations and balance the equities.  See, e.g., Ogan, 428 Mass. at 334 (turning to "[o]ver-all considerations of fairness" after analyzing the Ogan factors); Teehan, 2020 WL 6117763, at *5 (explaining that "[h]aving determined that the five factors outlined in Ogan have been met here, the court must still consider a balancing of the equities" (citation omitted)).

a)      <u>Unjust Enrichment to U.S. Bank</u>

Since the Supreme Judicial Court made clear that, in an equitable subrogation analysis, "[t]he court guards against the unjust enrichment of either party," <u>Ogan</u>, 428 Mass. at 329, the Court makes this consideration.

Katsenes argues that, if equitable subrogation is granted, U.S. Bank will receive a windfall and be unjustly enriched, because it did not pay anything for the assignment of the 2005 Mortgage. D. 144 at 13–14; D. 152 at 9–11; D. 156 at 12–13.  The loss to U.S. Bank, however, has been its inability to foreclose on the 2005 Mortgage.  <u>See U.S. Bank Nat'l Ass'n v. Twomey</u>, No. MICV200905070F, 2012 WL 2335295, at *4 (Mass. Land Ct. May 23, 2012), <u>aff'd</u>, 83 Mass. App. Ct. 1130 (2013) (explaining that "[w]hether U.S. Bank obtained the note by virtue of an arms-length purchase or by gratuitous transfer is of no consequence to its right to enforce the note or to demand assignment of the mortgage from MERS").  Katsenes attempts to distinguish <u>Twomey</u> arguing that, there, "because the note was secured by a first mortgage on the [Twomey] residence, any subsequent bearer of the note, such as U.S. Bank, also automatically acquired an equitable interest in the underlying mortgage which secured the note," while "in the present case U.S. Bank is not the holder of either a promissory note or a mortgage executed by [Katsenes] and is not suing on any instrument signed by her."  D. 156 at 13.  This, however, ignores the fact that the proceeds from the 2005 Mortgage paid off prior obligations executed and signed by Katsenes, who would have been liable on those obligations but for the 2005 Mortgage.

Accordingly, the Court concludes that U.S. Bank would not be unjustly enriched if equitable subrogation is granted.

b)      Knowledge

Knowledge is an appropriate consideration on a claim for equitable subrogation.  See Ogan, 428 Mass. at 331.  While the Supreme Judicial Court "decline[d] to adopt a bright line rule regarding subrogee knowledge," it explained that "[t]he degree of knowledge attributable to a subrogee concerning the existence of the intervening mortgage may nullify equitable subrogation." Id.  At the same time, however, courts may "allow subrogation where the subrogee has actual or constructive knowledge."  Id. (citation omitted).  The relevant inquiry is whether "under the circumstances, . . . the subrogee acted with sufficient knowledge to merit denying subrogation where it would otherwise be the correct result."  Id.

As a preliminary matter, the parties disagree whose knowledge is relevant.  Katsenes believes the Court should consider both BANA's and U.S. Bank's knowledge. D. 144 at 4–6, 8–9.  U.S. Bank, on the other hand, believes the Court should only consider BANA's knowledge, as it was the original lender.  D. 147-1 at 12–14; D. 149 at 3–4.  As both parties appear to agree BANA's knowledge is relevant, the Court will consider whether U.S. Bank's knowledge, as the second mortgagee, is relevant.  To begin, the Ogan Court highlighted that "knowledge attributable to a subrogee . . . may nullify equitable subrogation." Ogan, 428 Mass. at 331.  Here, the subrogee is U.S. Bank, not BANA.  Moreover, the cases U.S. Bank cites in support of its position either do not expressly address knowledge or state that only the original lender's knowledge is relevant. See, e.g., Deutsche Bank Nat'l Trust Co. v. United States, No. 12-cv-11038-NMG, 2014 WL 12573990, at *3–6 (D. Mass. Jan. 28, 2014); U.S. Bank Nat'l Ass'n, as Trustee for the RMAC Trust, Series 2016-CTT v. Menard, No. 18 MISC 000158 (RBF), 2020 WL 95483, at *5–6 (Mass. Land Ct. Jan. 8, 2020); Select Portfolio Servicing, Inc. v. Needel, No. 349527 (CWT), 2009 WL 1089438, at *4–6 (Mass. Land Ct. Apr. 22, 2009).  Massachusetts courts have considered the

knowledge of both the original and subsequent lenders, and this Court will do the same.  See, e.g., PennyMac Loan Services, LLC, 2021 WL 837060, at *10 (weighing the knowledge and culpability of the assignee and assignor in the balance of the equities).

As for BANA, there is evidence in the record that should have put BANA on constructive notice of Katsenes' interest in the Property:  (1) the properly recorded deed to the Property conveyed title to Katsenes and her husband, D. 145-3; (2) BANA prepared and signed the September 14, 2005 discharge of the 2004 Katsenes Mortgage and the document listed Katsenes' name as a mortgagor, D. 145-11; (3) the two Citizens Bank HELOCs named Katsenes as a mortgagor and were properly recorded at the time of the execution of the 2005 Mortgage, D. 145-4; D. 145-6; (4) on September 5, 2013, BANA paid off a tax taking on the Property, which listed Katsenes as an owner of the Property, D. 145-13; and (5) on April 7, 2016, Caliber, the then-servicer for the 2005 Mortgage, received a title report on the Property, which listed Katsenes as one of the owners and noted that only Mr. Katsenes had signed the 2005 Mortgage, D. 145-31 at 1, 4.[2]

As for U.S. Bank, there is evidence that it also had constructive knowledge of Katsenes' interest in the Property.  When BANA executed an assignment of the 2005 Mortgage to U.S. Bank on May 17, 2016, Caliber continued servicing the loan and did so through July 2021.  D. 150 at ¶¶ 42, 64.  Caliber's knowledge is imputed to U.S. Bank.  See Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C., 425 Mass. 63, 66 (1997) (explaining that

---

[2] Katsenes urges the Court to consider other pieces of evidence, including the missing "Borrower's Limited Title Agreement" document and another title examination conducted by Caliber, in support of her arguments regarding BANA's knowledge.  D. 144 at 4, 6.  U.S. Bank disputes the evidentiary relevance of these documents.  D. 147-1 at 12 n.11; D. 150 at 9–10.  The Court need not reach these arguments, because it otherwise assumes BANA had constructive knowledge of Katsenes' interest in the Property.

"[u]nder agency principles, notice to a corporation's agent is notice to the corporation. When an agent acquires knowledge in the scope of [his] employment, the principal . . . is held to have constructive knowledge of that information" (second alteration in original) (citations and internal quotation marks omitted)).

This constructive knowledge, however, does not defeat U.S. Bank's claim for equitable subrogation. First, there is no evidence to suggest BANA or U.S. Bank "willfully" disregarded information or knowledge of Katsenes' interest, which some Massachusetts courts have suggested would defeat a claim of equitable subrogation.[3] See Teehan, 2020 WL 6117763, at *5 (stating that "[t]here is nothing in the undisputed material facts to support Carolyn's contention that the Bank 'willfully' chose to ignore the results of the appraiser's report") (internal quotation marks omitted). Second, where the five Ogan factors are present and the subrogor would be unjustly enriched, as is the case here, Massachusetts courts have found equitable subrogation appropriate, regardless of the subrogee's constructive knowledge. See, e.g., Ogan, 428 Mass. at 333–34 (explaining that "[t]he plaintiffs expected to have first priority and paid a price that reflected that expectation. They had only constructive notice of the defendant's mortgage and mistakenly overlooked it. This error is not egregious enough to defeat their claim for equitable subrogation"); Option One Mortg. Corp. v. Oakhem, No. 07-P-401, 2008 WL 2491910, at *2 & n.2 (Mass. App. Ct. June 24, 2008)

---

[3] U.S. Bank makes the additional argument that any potential negligence on BANA's part in reference to the 2005 Mortgage does not preclude judgment in its favor. D. 147-1 at 15. While the Court need not reach this argument as Katsenes agrees negligence does not prevent equitable subrogation, D. 152 at 6, Massachusetts courts have, indeed, held that negligence is not outcome determinative, see, e.g., Ogan, 428 Mass. at 332 (citing cases); Bank of Am., N.A. v. Diamond Fin., LLC, 88 Mass. App. Ct. 564, 571 (2015) (explaining that "the subrogee's negligence or lack of diligence does not bar recovery and is only a material consideration when the intervening lienholder has been prejudiced" (internal citation omitted); Bank of N.Y. v. Medway Lumber & Home Supply, Inc., No. CV200802229, 2010 WL 6218736, at *8 (Mass. Super. Ct. Nov. 29, 2010) (citing cases).

(explaining that "the plaintiff had constructive notice of the recorded joint tenancy deed even if, as claimed, it did not have actual notice," but "[t]he defendant is mistaken in suggesting that [the plaintiff] should have been required to show evidence for summary judgment that it had no knowledge of the joint tenancy.  The [Ogan] opinion says nothing that would prevent equitable subrogation from being applied even where the subrogee has actual or constructive knowledge of a prior interest"); Teehan, 2020 WL 6117763, at *5 (explaining that "even when there is actual knowledge of an intervening interest, the court must still determine if 'the subrogee acted with sufficient knowledge to merit denying subrogation where it would otherwise be the correct result'") .

Furthermore, the proper focus is on the intent of the parties when the loan was made.  See Ogan, 428 Mass. at 329 (explaining the court's role in equitable subrogation claims as "guard[ing] against the unjust enrichment of either party by granting to the later mortgagee the priority status intended by the parties to that transaction, only so long as the interests of the intervening mortgagee are not prejudiced").  Here, as discussed above, there is evidence that both Mr. Katsenes and BANA intended to use and did use the proceeds from the 2005 Mortgage to pay off the other Katsenes mortgages and that Katsenes' interest in the Property will not be prejudiced.

As such, neither BANA's nor U.S. Bank's constructive knowledge warrants denial of the claim for equitable subrogation.

c)      Title Insurance

In the case at bar, after U.S. Bank acquired the 2005 Mortgage, LSF9 Master Participation Trust requested a title insurance policy from Carrington, as WFG's agent, on July 25, 2016.  D. 150 at 16.  That same day, Carrington's title examination revealed that the Property was in the name of Katsenes and her husband and that Katsenes was not a signatory to the 2005 Mortgage.

D. 145-38 at 1, 4.  In 2016, Carrington, nevertheless, issued a lender's title policy retroactive to August 19, 2005, describing the property as owned in fee simple by Mr. Katsenes.  D. 145-40.  Katsenes argues that the presence of title insurance is a proper consideration in the Court's balancing of the equities and that the proper defendant in this action is WFG.  D. 144 at 10–12; D. 156 at 7–12.

Both of Katsenes' arguments have been previously addressed and denied by the Massachusetts Appeals Court.  In Diamond Fin., LLC, the Massachusetts Appeals Court resolved a dispute between BANA and Diamond Financial, LLC ("Diamond") as to which mortgagee would have first priority.  Diamond Fin., LLC, 88 Mass. App. Ct. at 564–65.  Diamond's primary argument "appear[ed] to be that [BANA] is barred from receiving an equitable subrogation because [BANA] could make a title insurance claim, and therefore has a remedy at law."  Id. at 565.  The court held that a title insurance claim was an "inadequate and inappropriate" legal remedy because "a legal remedy in the form of money damages would not restore the plaintiff to its rightful senior position."  Id. at 570.  Furthermore, a title insurance claim "would also result in the unjust enrichment of a junior interest because of the potential unjustified windfall it would receive by advancing to the priority position."  Id.  The court proceeded to explain that equitable subrogation was appropriate because BANA had "no legal remedy against" Diamond, only as to its title insurer.  Id. at 571.  The trial court in Diamond Fin., LLC further observed that granting equitable subrogation would only entitle BANA to the amount it paid off, not the full amount of the mortgage it issued to the borrower.  Bank of Am., N.A. v. Miranda, No. 11 MISC 457199(JCC), 2014 WL 3529768, at *4 (Mass. Land Ct. July 16, 2014), aff'd sub nom. Bank of Am., N.A. v. Diamond Fin., LLC, 88 Mass. App. Ct. 564 (2015).  In Diamond Fin., LLC, the Massachusetts

Appeals Court also addressed Katsenes' argument regarding the proper defendant.  There, the court explained:

> Diamond also argues that the action does not contain a real party in interest, because [BANA]'s title insurance company is involved in prosecuting the claim.  [BANA] is the named party who has a real interest in the litigation. . . . There is no merit to the defendant's argument that this action is missing a real party in interest.

Diamond Fin., LLC, 88 Mass. App. Ct. at 565 n.5 (internal citation omitted).  Therefore, the existence of title insurance[4] and WFG's interest in this litigation do not preclude equitable subrogation in U.S. Bank's favor.  That otherwise would be the end of the matter, but Katsenes relies upon three cases contending that they require an opposite conclusion.  They do not.

First, she cites to Wells Fargo Bank, N.A. v. Nat'l Lumber Co., in which the Massachusetts Appeals Court noted that "[o]f course other remedies, including title insurance claims and malpractice actions, may be available or more appropriate [than equitable subrogation] depending on the circumstances."  Wells Fargo Bank, N.A. v. Nat'l Lumber Co., 76 Mass. App. Ct. 1, 5 n.4 (2009).  The Diamond Fin., LLC court, however, concluded that in circumstances involving unjust enrichment to the junior lienholder—here, Katsenes—a title insurance claim is not the appropriate remedy.  Diamond Fin., LLC, 88 Mass. App. Ct. at 570–71.  Katsenes argues that the Nat'l Lumber

---

[4] Katsenes also raises the related argument that WFG, as the company that retained the attorneys to represent U.S. Bank in this matter, D. 145-53, will receive a windfall if equitable subrogation is granted, D. 144 at 12.  This argument is without merit because "initiating suit to cure a title defect is generally an option available to the title insurer under a standard title insurance contract."  GMAC Mortg., LLC v. First Am. Title Ins. Co., 464 Mass. 733, 743 (2013).  Along the same lines, Katsenes argues that LSF9 LLC had a right to rescind its purchase of the 2005 Mortgage because BANA represented in the agreement that the Property was free of all encumbrances and the agreement allowed for rescission if the Property was not free of all encumbrances.  D. 144 at 14; D. 145-29 at 12, 15.  As she was not a party to that agreement, she has no standing to enforce its terms.  See Barrett v. Mortg. Elec. Registration Sys. Inc., No. 14 SBQ 16514-06-001 (KCL), 2017 WL 5969766, at *3 (Mass. Land Ct. Nov. 30, 2017) (concluding that a borrower "is not, by any stretch of the imagination, a 'third-party beneficiary' of" a loan purchase agreement and is instead "an arms-length stranger to them" (citing cases)).

<u>Co.</u> court was "obviously referring to situations in which title insurance would, in fact, provide a full and complete adequate remedy at law, such as in the present case.  In the present case U.S. Bank does have title insurance and does not need [Katsenes'] interest in the locus to be made whole.  Money damages would give it a full and complete remedy."  D. 156 at 7–8.  But as Katsenes has repeated, U.S. Bank paid nothing for the assignment of the 2005 Mortgage, so money damages would not make it whole.  U.S. Bank's actual loss, as described above, has been its inability to foreclose on the 2005 Mortgage.

Second, Katsenes cites to <u>Stewart Title Guar. Co. v. Kelly</u>, in which the Massachusetts Appeals Court denied contractual subrogation relief to a title insurance company.  <u>Stewart Title Guar. Co. v. Kelly</u>, 97 Mass. App. Ct. 325, 326 (2020).  There, the title insurer brought an action for breach of contract and unjust enrichment against the defendant-borrower, based upon a title insurance policy it issued to JP Morgan Chase Bank, N.A. as a mortgagee to the defendant-borrower.  <u>Id.</u>  This case is inapposite, because, as discussed above, this case is between Katsenes and U.S. Bank, not Katsenes and WFG and, <u>Stewart Title Guar. Co.</u> did not suggest that JP Morgan would not have had a claim against the defendant-borrower simply because it had title insurance.

Third, Katsenes cites to <u>Wells Fargo Bank, Minn., N.A. v. Commonwealth</u>, in which the Kentucky Supreme Court found equitable subrogation inappropriate because "the most responsible party [was] not a party to the case," but rather it was the title insurance company that "bungle[d] the title search."  <u>Wells Fargo Bank, Minn., N.A. v. Commonwealth</u>, 345 S.W.3d 800, 808 (Ky. 2011).  However, where Massachusetts courts have spoken on the issue, this Court is required to follow any direction from another state court applying that state's precedence.

Accordingly, U.S. Bank's title insurance does not preclude equitable subrogation.  See <u>U.S. Bank, N.A. v. Martinez</u>, No. 13-P-1765, 2014 WL 4450424, at *2 (Mass. App. Ct. Sept. 11, 2014)

(affirming lower court's determination that a title insurance claim was not an appropriate remedy because it is not "certain," does not "serve[] the same ends of justice," and "cannot be asserted against the defendant in this suit and must be brought through other actions against third parties" (citation omitted)).

           d)    <u>Laches</u>

Lastly, Katsenes presses that U.S. Bank's claim for equitable subrogation is barred by laches. D. 144 at 17–20; D. 156 at 14–19. Specifically, she argues that, due to BANA's and U.S. Bank's delay in bringing a claim, she was deprived of Mr. Katsenes' testimony as to the intent of the parties in executing the 2005 Mortgage and of Mr. Katsenes amortizing either the 2005 Mortgage or the other Katsenes' mortgages. D. 144 at 17–20; D. 156 at 14–19.

Laches is an equitable defense that applies "if there has been unjustified, unreasonable, and prejudicial delay in raising a claim." <u>Srebnick v. Lo-Law Transit Mgmt., Inc.</u>, 29 Mass. App. Ct. 45, 49 (1990) (citing cases). Delay in and of itself is insufficient; rather, it must "work[] disadvantage to another." <u>Moseley v. Briggs Realty Co.</u>, 320 Mass. 278, 283 (1946) (internal citation and quotation marks omitted). In the context equitable subrogation, Massachusetts courts have emphasized that the delay must prejudice, induce a change in the position of, or result in injustice to the junior lienholder. <u>See</u>, <u>e.g.</u>, <u>Thomas</u>, 2018 Mass. Super. LEXIS 2688, at *8; <u>U.S. Bank Nat'l Ass'n v. Able Invs., Inc.</u>, No. 13 MISC 476635, 2015 Mass. LCR LEXIS 29, at *12–13 (Mass. Land Ct. Jan. 2, 2015); <u>JPMorgan Chase & Co., Inc. v. Casarano</u>, No. 07 MISC 344419(AHS), 2010 WL 3605427, at *4 (Mass. Land Ct. Sept. 16, 2010); <u>Bos. Five Cents Sav. Bank v. BayBank</u>, No. 185194, 1993 WL 13154826, at *5 (Mass. Land Ct. Mar. 12, 1993).

None of those results apply here. Granting equitable subrogation in this case would not prejudice Katsenes because it would only require that she pay off "the funds disbursed [that were]

actually applied toward the payment of [her prior obligations].  There is no right of subrogation

with respect to any excess funds."[5]  Ogan, 428 Mass. at 330 (citation and internal quotation marks

omitted).  Here, the payoff amount was $334,738.90, the sum of the $134,285.25 used to pay off

one or both of the Citizens Bank HELOCs and the $200,453.65 used to pay off the 2004 Katsenes

Mortgage.  See, e.g., D. 148-16 (noting that the total payoff amount as of August 10, 2005 was

$134,285.25 for one or both Citizens Bank HELOCs); D. 148-13 at 2 (establishing that, on

September 2, 2005, Mr. Katsenes received an advance from the 2005 Mortgage for an amount of

$134,285.25); D. 148-12 at 3 (establishing that, on August 3, 2005, BANA believed that Mr.

---

[5] To the extent U.S. Bank claims a right to subrogation in excess of the amount disbursed to pay off Katsenes' prior obligations, D. 146 at 1–2, it is incorrect.  The Supreme Judicial Court explained that subrogation is granted "only to the extent that the funds disbursed are actually applied toward the payment of the prior lien.  There is no right of subrogation with respect to any excess funds."  Ogan, 428 Mass. at 330 (quoting Restatement (Third) of Property (Mortgages) § 7.6 comment e, at 520 (1997)).  While U.S. Bank concedes this amount is $334,738.90, D. 147-1 at 6, it, nevertheless, suggests that it is "entitled to the extent of funds used to pay off the prior lien, subject to [the] prior lien's terms and interest," id. at 8.  In support of that position, U.S. Bank cites to BAC Home Loans Servicing, L.P. v. Savankham, No. 11 MISC 457188(HPS), 2016 WL 6878686 (Mass. Land Ct. Nov. 21, 2016).  This case does not help its cause, because the court there did not grant equitable subrogation and merely considered the interest rate and terms of the loans in balancing the injustice to both parties, before ultimately concluding that equitable subrogation was inappropriate.  BAC Home Loans Servicing, L.P., 2016 WL 6878686, at *4.  Even if BAC Home Loans Servicing stood for that proposition, the Massachusetts Appeals Court has more recently explained that equitable subrogation is granted "only to the extent of the balance outstanding on the [first loan] at the time it was satisfied by proceeds of the [second loan]." Teehan, 2021 WL 5829965, at *1 (explaining that "the plaintiff's mortgage is subrogated only to the extent of the balance outstanding on the 2006 note at the time it was satisfied by proceeds of the 2011 loan (and that the subrogated mortgage secures the 2011 note rather than the 2006 note which was paid in full and satisfied from proceeds of the 2011 note).  The subrogated mortgage confers on the plaintiff security for the 2011 note, but only to the extent of the outstanding balance on the 2006 note that is the source of the plaintiff's entitlement to subrogation.  While it is of course true that the 2011 note includes the right to collect accrued interest and other penalties resulting from nonpayment, that obligation arises under the note, and does not change the extent of the plaintiff's right to equitable subrogation to the position of its earlier mortgage.  Any action by the plaintiff to recover amounts due on the 2011 note in excess of those secured by subrogation to the 2006 mortgage are properly directed to the maker of the 2011 note (or, in this case, her estate), and do not enjoy the benefit of the security of the 2006 mortgage").

Katsenes was "planning on using $200K of the $500K to payoff his existing [Fleet National Bank] Line of Credit"); D. 148-13 at 2 (establishing that, on September 2, 2005, Mr. Katsenes received an advance of $200,453.65 from the 2005 Mortgage); D. 145-11 (establishing that, on September 14, 2005, a discharge of the 2004 Katsenes Mortgage was executed).  Likewise, equitable subrogation would not induce a change in her position or result in injustice because, as of the date of her deposition in this matter, she did not know whether the prior mortgages had been paid off. D. 148-4 at 13.  Therefore, Katsenes would simply be placed in the position she would otherwise be in, if not for the 2005 Mortgage.

Accordingly, as the five Ogan factors apply here and no other consideration requires denial of U.S. Bank's claim for equitable subrogation, summary judgment is granted to U.S. Bank with respect to Counterclaim Count II.

### B. Equitable Mortgage (Counterclaim Count I), Unjust Enrichment (Counterclaim Count III, and Quantum Meruit (Counterclaim Count IV)

The Court understands the parties' positions to be that the remaining counterclaims turn on the same equitable principles as U.S. Bank's counterclaim for equitable subrogation and there is no need to analyze the remaining counterclaims if equitable subrogation is granted.  D. 144 at 2–3; D. 147-1 at 17.  Accordingly, in light of the Court's decision on Counterclaim Count II, the Court does not reach the other counterclaims, see Deutsche Bank Nat'l Trust Co., 2014 WL 12573990, at *6 (declining to address as unnecessary claim for equitable mortgage, where claim for equitable subrogation was granted), and denies summary judgment as to them as moot.

### C. Declaratory Judgment (Count I)

In Count I of her amended complaint, Katsenes sought a declaratory judgment, stating that the 2005 Mortgage was subject to her right of survivorship and became extinguished upon Mr. Katsenes' death.  D. 85 at 7.  As equitable subrogation has been granted, summary judgment on

Count I is granted to U.S. Bank to this extent and is denied in its entirety to Katsenes as to Count I.

### D. <u>Violation of Mass. Gen. L. c. 93A, §§ 2, 9 (Count II)</u>

U.S. Bank also seeks summary judgment of Count II, in which Katsenes accuses it of unfair and deceptive business practices in violation of Mass. Gen. L. c. 93A, §§ 2, 9.

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. c. 93A, § 2(a). To sustain such a claim, the plaintiff must prove (1) the defendant committed an unfair or deceptive act or practice; (2) the unfair or deceptive act or practice occurred in the conduct of any trade or commerce; (3) the plaintiff was injured; and (4) the defendant's unfair or deceptive conduct was the cause of the injury. <u>Rafferty v. Merck & Co.</u>, 479 Mass. 141, 161 (2018) (citations omitted).

In essence, Katsenes claims U.S. Bank engaged in unfair and deceptive business practices by litigating the prior land court action and this matter while knowing that the 2005 Mortgage had been extinguished upon Mr. Katsenes' death. D. 152 at 11–16. This cannot amount to unfair and deceptive business practices where this Court has determined equitable subrogation is appropriate. <u>See</u> <u>Rental Prop. Mgmt. Servs. v. Hatcher</u>, 479 Mass. 542, 552 (2018) (explaining that "[g]enerally, litigation conduct alone is not a sufficient basis for a c. 93A claim"). More fundamentally, "a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made." <u>See</u> <u>Duclersaint v. Fed. Nat'l Mortg. Ass'n</u>, 427 Mass. 809, 814 (1998) (citing cases).

Accordingly, U.S. Bank is entitled to summary judgment as to Count II.

**VII.**     **Conclusion**

For the foregoing reasons, the Court DENIES Katsenes' partial motion for summary judgment as to Count I and Counterclaim Count II and denies summary judgment as to the remaining  counterclaims as moot, D. 143, DENIES her motion to strike certain exhibits offered by U.S. Bank, D. 154, ALLOWS U.S. Bank's motion for summary judgment as to Count I to the extent of equitable subrogation, and as to Count II and Counterclaim Count II, thus granting equitable subrogation in the amount of $334,738.90, and DENIES summary judgment as to the remaining counterclaims as moot in light of the Court's ruling on Counterclaim Count II, D. 146.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge